page. Thank you. Resource for the court, thank you for your testimony, and this may be final. Thank you, Mr. Court. You may proceed. Your Honors, if I may please the court, counsel, Your Honors, this case obviously revolves around the reasonable without standard, and it's important in this case to remember, although this was a bench trial, and perhaps because it was a bench trial, we're not challenging the credibility determinations, we're here as a matter of law, talking about what sort of evidence is, as a matter of law, sufficient to convict someone beyond a reasonable doubt. And that's important to remember, because one of the things that is talked about in the standard reasonable doubt case law, in relationship, et cetera, is whether it is so unreasonable, improbable, or unsatisfactory, and I think this sort of falls into the unsatisfactory category, as far as the evidence. So unsatisfactory that no reasonable person would have appeared at the trial court's judgment? Correct, yes. No reasonable trial fact would have found him guilty, correct. So, this is not a matter of whether we think Mr. Hernandez was involved in this drug deal, or intentionally aided in the bed, I guess, is the real standard, or whether we believe it, or even whether it's more probable than not. This is reasonable doubt, the highest standard of law, and I cited some federal cases that talk about this importance, the Jones cases, they're both called Jones, the ones from the Seventh Circuit, ones from the Justice Department. The Jones is the one that he brought? No, they're not factually all that. How many federal cases are you aware of, or state, outside of our jurisdiction, that have cited heat runs as part of the evidence in a sufficiency of the evidence claim? Your Honor, I actually did not find any, which is sort of somewhat surprising if this is so, supposedly, this common drug dealer tactic that everyone uses. It is a common drug dealer tactic, according to federal cases, it's very common. I don't see any case law that talks about this being the magical factor, I guess is what I'm saying. I'm not saying it doesn't happen. The trial court here said, if it were only the heat run, I wouldn't have found your client guilty. Didn't he say that? He didn't say that, correct. He said it was the relationships, the plate, he gave minimal weight to the aftermarket hidden compartment, but did consider that. So he looked at, and his ruling was quite detailed, looked at all the facts and said it's not the heat run itself, it's not mere presence, it's much more than that. Well, one of the factors I can address with your Honor, then, is the relationship between them. Because I think the court did put particular emphasis on that, that they're brothers and father, respectively. And I would actually take the opposite inference on that. If you're engaging in these sort of tandem driving with strangers, I think that's more likely you're involved in something more nefarious. A familial relationship actually much more goes in line with your following your father to a restaurant to eat along with your brother, or doing whatever family things people do. The court rejected that notion and said that that's not even a plausible, doesn't pass the smell test. That they're going to eat and you're driving all over? Again, I think one thing that we have to remember is we have to look at what was in the defendant's mind. Because... It seems like you're making a circumstantial evidence argument that the state somehow was required to dispel all meaningful theories of instance, and that's not the standard? No, I understand that as sort of the old pre-requisite relationship, or one of the cases. Yes. Anyway, but yeah, I understand that as pre-case law. I'm not making that argument at all. I'm arguing how could, as a matter of law, anyone conclude that they have no reasonable doubt that Mr. Hernandez intentionally aided and abetted in this particular drug deal? That's the very specific argument I'm making. I think what's helpful to this court is that this court already has two other cases that are pretty factually similar, and I think this case would be a sort of a fitting trilogy to the end of those cases. One would be Ortiz, and the other would be Rodriguez-Chavez. And the important thing in Rodriguez-Chavez, of course I cited it numerous times in my brief, was that somewhat similar tandem kind of driving cases where the defendant was stopped and engaged in behavior that was quite suspicious, you know, the way he relieves for no reason, et cetera. They said if the standard was, this court said, if the standard was reasonable doubt, the defendant would make a good point. And obviously a dicta is nothing concrete, but I think that's very helpful guidance in how to look at these cases. No one's saying that you can't take all these factors into account for public cause, or even if this was a civil forfeiture proceeding, perhaps, you know, more likely than not. But reasonable doubt, that's quite a different thing. You know, I think we also have to remember all the mere presence case law, the Washington case, the Perez case that I cited, other cases as well. Because the question is, even if, and again, I'm not saying the evidence would support this, even if you could say Mr. Hernandez knew exactly what his brother and father were doing, and he followed them along, waited in the parking lot for the drug deal, go down, and then left. Let's just make that, you know, a leap. I think it's a leap. That's still not enough, because it doesn't show that he intentionally aided and abetted. So mere presence and knowledge is not enough, and I think that's important. How does the heat run factor into that argument? Well, the heat run, I suppose, if you want to factor in the heat run on that, I suppose you could make the conclusion that the heat run was done to aid and abet. I agree with Your Honors. However, if you analyze the heat run evidence, there is so much wrong with that evidence, and I can get into it right now. First of all, heat runs are oftentimes involved, erratic driving to the point of going down one-way streets the wrong way, going down alleys, et cetera. That's what Detective Amshaw said. And he admitted none of that occurred here. Also, so what was the heat run? The heat run was stopping on the way, just stopping along the street. I guess the inference is to let someone go by and see if you're following. Well, it's also consistent with someone just looking at the house. It's consistent with someone using a cell phone. Oh, I got a call. I better pull over. There's a myriad of things that can be consistent. The trial court said that the reasonable inference, together with all the other evidence, we led them to the conclusion that your client was guilty, that the heat run was only part of it. So, again, you're going back to these quote-unquote innocent explanations for the defendant's behavior, and the State's not required to dispel those. Your Honor, this is where I would tend to disagree to the extent that, because Justice Burke just mentioned, well, if it's just mere presence and knowledge, that's not sufficient. Well, I shouldn't say that. What I said was that, and then Justice Burke said, well, how about the heat runs? And I admitted, if this was a true, true heat run, I think that would be sufficient for aiding and abetting. This was a heat run by a better driver. I'm sorry? He didn't break the law. It's a heat run by somebody who's familiar with the rules of the road. He's a better driver. Well, Your Honor. The trial court went into extensive discussion about the heat run, the turning around, the traveling, and you rejected the notion that they were just going to a restaurant. I would argue he was the worst heat run driver in the world, because what kind of heat run driver goes directly back to his own house? He didn't go back to his own house. Well, no, before that, though, he made no attempt to conceal that he was at his own house. That wasn't his own house, actually, was it? Well, it was the house that declined the drug dealing that was going on. Also, too, I think it's very important to remember in this case, and also that's why I cited the Ortiz case, is law enforcement could have done, if they really wanted to prove their case, really wanted to see the truth of this matter, test the drugs for fingerprints. That's what they did in Ortiz, and guess what? The defendant's fingerprints were on it. They didn't do that because they, we don't know why they didn't do it, but I think the inference is because they knew there was a good chance his fingerprints would not be on those drugs. There's no physical evidence whatsoever, and that was so important in the Ortiz case. So what about the aftermarket compartment? The trial court said putting very limited weight on it. It wasn't limited, it was a fact. Well, that is the one portion, surprise, surprise, that I do agree with the trial court on, that there was very little weight weight to be put on it. The court did not consider that, but he did consider minimally the aftermarket. That's an odd thing, isn't it, to have a compartment just about the right size to conceal seven kilos of cocaine? Well, if the implication that he did conceal the cocaine, there's not one shred of evidence that there's any drug remains in there. Which brings up the other question that you ask, is why no fingerprints? Why no fingerprints? Why didn't they test for fingerprints? I guess I'm saying that's perhaps why they may not have, or... Well, I think if you're in a truth-seeking place, which law enforcement should be, you should want all the facts in the case, not just the ones that support your own case. But as far as that aftermarket thing, the trial court was right in this sense, is that clearly it's an odd thing, but there was also testimony where admissions from law enforcement, that this could be used for lawful purposes as well. But more importantly, what the trial court found was, there's no evidence that it was used in relation to this particular case. So the only inference would be that maybe, in general, he had engaged in drug deals on his own or on separate occasions. The problem is that you have so many odd things in this case. You have this driving five miles one way on 31, pulling into a subdivision, stopping, driving a quarter mile, stopping, turn around, driving back on 31, parking a block and a half away from your house, and then walking to your house, having two cell phones, having the aftermarket thing, driving in tandem, driving 20 miles away from Elgin, only to double back to go to a restaurant and handle the park. I mean, there's just so many. I mean, each one of these things, you could pick apart and say, there's an innocent explanation for it, and that's not proof you have a mutual doubt. But when you put together all of these odd things, and then it results in a seven-kilo drug heroin delivery, you know. Well, two things about that. It looks like a duck. Well, I would respectfully say that the Jones cases say that it looks like a duck, it cracks like a duck, is not the law that we should be using, because the Jones court says you cannot pile inference upon inference to find proof beyond a reasonable doubt. That's all this is, inference upon inference. It's not the defendant's burden to explain away every single thing that happens, although we did try our best to give evidence and explanations to many of these things. We don't want to start attaching criminal liability to such a serious case. The man's doing 20 years in prison because we find his behavior odd, because we find many of the things odd. Two odd things are not enough, but how many are, 10, 20? I mean, you need proof beyond a reasonable doubt. I don't care if there was 10 odd things or 100 odd things. It still would not be proof beyond a reasonable doubt, because it would be building inference upon inference. And with that, unless the Court has other questions, I'd be happy to. Is your father John Dvorak? No, I'm from Wisconsin. Okay. But thank you. It's actually a more common name than you would think. All right, thank you. Thank you, Mr. Dvorak. You will have time for rebuttal argument. Ms. Forman, you may proceed. Thank you. Good morning, Your Honors. Counsel, may it please the Court, I'm Mary Fleming, Assistant State's Attorney on behalf of the people. Your Honors, this is a case that the trial court characterized as containing a substantial amount of evidence about the events in this case. The surveillance of this house started because of the owner being caught in Arkansas with over $100,000 in bulk currency. Then once the surveillance starts, people are coming and going from the house. We see defendant do the heat run that we've spoken a lot about. We see him come back to the house and park a block and a half away. We see him leave the house with his brother, go to a townhouse development, come back out with his brother in another car with his father. He follows them for 20 miles. They're staying together. They're making rapid lane changes. Everything about this shows that defendant is still doing counter-surveillance in this case. Could you comment on defendant's reliance on Jones? The federal case? Federal case. And the argument that really the state's case was filing inference upon inference and really nothing substantial. But in Jones, we have a defendant who was merely present in the car. She wasn't tied to the drugs in any way. The drugs were in a suitcase belonging to the driver. She wasn't the driver. There weren't any actions on her part. We have an entirely different case here where we have a defendant who was, we can see his intent from the beginning. We can see him doing a he-run. We can see him doing counter-surveillance while they're driving. We can see him doing surveillance of the parking lot. This isn't just an inference upon inference. We have pretty clear evidence of his intent in this case. The trial court looked at the family relationship here as evidence of guilt. If the federal counsel argues the alternative, then it's actually if they were not family members and they were strangers, it would be more of an inference of guilt. How do you respond to that? Well, courts, including this court, have been pretty clear that you wouldn't bring an innocent person into a case where you're going to conduct a drug deal. You're not going to set up someone who doesn't know and who can provide evidence against you. To believe that coincidence, you would have to believe all the coincidences in this case. Really, the evidence shows that this was an enterprise. This was clearly from the beginning. There was a large amount of drugs. There wasn't any money exchanged. We leave the house in Elgin, we drive past Hanover Park, we go to Addison, to the Walmart. Maybe the only Walmart in the western suburbs. None of this really makes sense. No one gets out of the car and goes into the Walmart. Instead, a third car pulls up and parks next to them. That person gets into the car, and he leaves the car with a big bag that is no surprise to anyone, then contains a huge amount of heroin, 7 kilos, a street value of $1.4 million. This was pretty clearly a very well-run enterprise. Was there evidence presented of telephone communications? There was a lot of testimony. It starts on page 170 of the record about the phones. The officer testified that he looked at some of the text messages. He didn't say what the text messages were. There was some indication that the officers weren't able to get into all of the phones, which would, again, show that this is a very well-run criminal enterprise. The fact that the police couldn't get all of the messages, and they spoke as well about how that information wasn't really relevant. They used it a lot of times to show where the defendants are. Here we knew. We had several officers watching. They were switching off. They weren't following the defendant so closely that he could pick them up, and he apparently never did. They have several people that are going different routes, that are parked in different places, but they're able to establish where the defendants are at all times. Did you look at any of the cases from foreign jurisdictions from either other states or the federal system referencing testimony by law enforcement officers and narcotics officers specifically about heat runs? I did look at some cases. I didn't think there was anything exactly on point that was any closer than Rubalcaba or Rodriguez Chavez or Ortiz. Other than the fact that it's a common tagline. It does seem very common, and all of the officers testified to that. They testified to their extensive training in that, and they testified that they weren't really sure how much training a defendant would get. There's not really a CLE you can go to on heat runs if you're a defendant. You might learn from someone in your family. You might pick it up as you go along, but there was a lot of testimony about how this is a well-established tool that law enforcement uses. Scott noted that there was no money to change hands. How does that add to the proof of the defendant's guilt, whether there's money to change hands or not? How is that relevant? It may speak to the fact that this was a criminal enterprise that was pretty well run. That may have occurred down the line. It was clear that the drugs in this case weren't ready to be put out on the streets. They had to be cut. They had to be repaired. This was perhaps just a middleman taking the drugs. The record doesn't really speak to that part any more than that. Other than the fact that there must have been some trusting relationship? Of course. That person got into the car. They let him in the car, and when he left the car, he had this bag with a very substantial amount of drugs, at least $1.4 million worth of drugs. Clearly, they trusted each other, as did everyone involved. Are there no further questions? Was there testimony or evidence that each of the three defendants had two cell phones? Yes, they did say that. Anything else? No. Thank you. Mr. Borek? Your Honor, the state leader, it's the sort of well-known principle that you don't involve innocent people in your activities. However, what we have here is a father who clearly got his own son, not my client because I'm here arguing that he's innocent, but at a minimum, the other son involved in drug dealing. This is a morally bankrupt person, the father, who gets his own son involved in drug dealing. Do you think this morally bankrupt person cares if his other son is along for the ride and he tells them, I've got to run an errand, follow me along? We're assuming this person's moral. He's a morally bankrupt person, and I don't think we can assume the normal things about this person. With regard to the well-run organization, I think it's first important to remember it's not the people of the state of Illinois versus this particular well-run organization. It's the people of the state of Illinois versus Jose Hernandez. They have to prove that he, on this particular day, in this particular amount of drugs, intentionally aided and abetted it, and they have to prove it beyond a reasonable doubt. With regard to that well-run organization, however, again, whether it doesn't sound so well-run, or at least the federal was involved in it, because he could have easily, if he was trying to evade law enforcement, he wouldn't have parked in front of his own, the house that we're talking about originally. Two, he could have lost law enforcement at that condominium complex because law enforcement couldn't see him for a half hour, 45 minutes, and yet he comes right back out. And then finally, if you're going to be a lookout, why in the world would you park in a place where you cannot see the drug deal go down? That makes no sense that he's a lookout. I thought the evidence was he could see through his rearview mirror the drug deal, but that he was looking out at the evening. Well, it depends on which park you're talking about. The initial part where he's initially parked, he's parked sort of behind him, and maybe he could have looked through a rearview mirror, but he would have had to really strain himself. But more importantly, the other part where they go to a different part of the parking lot, that he had no ability to look for at all. So I think that seems very odd that you would park in that manner. You could have just went right next to it. I just don't see the purpose of what he did. What value did Jose Hernandez add to this drug operation on this particular day? Nothing. What if he's just keeping track of his drugs? What if they're his drugs and he's just there to keep track of them, not necessarily as a lookout to warn them if the police were coming up, but just to make sure that everything happened the way it was supposed to happen? Well, first of all, I think that would be speculation, because there's no evidence that they're his drugs at all. That would be very much speculation. And, again, it's back to the fact that mere presence with knowledge that it happened, that it's going to happen, is not enough, because that's not aiding and abetting. The police did testify, though, that he was engaged in counter-surveillance, or in their opinion, counter-surveillance techniques on the heat run, and then also on the drug run, correct? Well, they said it could be consistent with that, but, again, that's just one inference that you can make. It could also be consistent with someone who's just there. There was no objection at trial to the qualifications of the officers to render the opinion that this was a heat run, was there? No, but if their opinion of an officer is enough to convict, I think we'd all be in big trouble. Well, the court didn't say the opinion of the officer was what he was relying upon exclusively. He relied on all the evidence, but in the court's view, the heat runs and the court liked the discussion about the driving. The court said he's placed an appropriate weight on that, but if it was only the heat run, it would have been an acquittal, so it was much more than that. But when you pick apart the evidence, it can't be much more than that, because the rest of it is just mere presence and mere presence on the scene. And relationships, blood relationships. Well, and, again, I think I've already explained something about relationships. If it was truly a heat run, and there's evidence that it was a heat run, and then he did nothing else, isn't he still aiding and abetting the delivery? If there was proof beyond a reasonable doubt that he intentionally engaged in a heat run in order to facilitate this struggle, I agree. That would be proof beyond a reasonable doubt. But, again, if you look at the testimony and you pick apart that heat run evidence, there are numerous times where the officer admits that much of what Mr. Hernandez did is inconsistent with the heat run and consistent with other innocent activities. Is it arguable that it would be pretty unusual to have a $1 million cocaine deal and not have any counter surveillance at all? Is that arguable? It's arguable, but that's one thing one could argue. Again, that's just one inference. It's one factor. One could argue it's also odd that one would put yourself into potentially a 20-, 30-, 40-, 50-year prison sentence just based on just why would you even do this? I don't see the added value of this. That's true of every large-scale drug transaction. Why would you ever do it? Because the money is so great. People are willing to take the risk. I guess what I'm saying is what added value do you have by doing this? None. I don't see the added value that Mr. Hernandez gave here. The added value is to spot a potential arrest before the arrest happens. Okay. Well, again, if that's the situation, it's so inconsistent with that behavior. And, obviously, everything he did, much of what he did would have been totally counter to that. If he was truly doing surveillance and being a lookout, he could have easily lost the officers. He could have easily put himself in a position to see if someone would have. That's not what the heat run is designed to do, not lose the officers, is to ensure that there is no surveillance, that the police aren't there, that you're not going to be uncovered. Isn't that really what a heat run is all about?  Yes. Certainly that is one of the things that you can do. But then if that's the case, okay, then you're doing things that are not consistent with doing that. For example, if you really want to find out if someone is tailing you, again, go down one way street the wrong way. You would do that to the extent that it's necessary. And so if you've done these routine things that he did and then he finds that he is a little suspicious, then he might, if he's more suspicious, go down a street one way the wrong way. Or he might do one of these other steps. But you take it to the point, I would think, that is necessary in this particular case, and he obviously felt that it wasn't necessary. That's the whole problem with relying on this evidence in the first place. We're all here guessing what was going on in the mind of Jose Hernandez. We're all guessing as to why he may have done what he did. When there's very reasonable explanations for all of it. I'm not saying that isn't a possibility. I'm not saying it's not a possibility that he was, in fact, doing a heat run. These are all possibilities. But proof beyond a reasonable doubt should mean something these days. Because I think if this case satisfies that standard, then I think lawyers across Illinois are going to look at this and say, Why would I ever rely on a bench trial ever again? Because the law is going to basically allow the prior effect to do whatever they want. And no review at all is going to be necessary. Thank you, Mr. Duvall. Court, thanks both attorneys for your arguments today. Thank you. And we are adjourned.